Anthony M. Barnes (Bar No. 199048)
Jason Flanders (Bar No. 238007)
Email: amb@atalawgroup.com
AQUA TERRA AERIS LAW GROUP LLP
490 43rd St., Ste. 108
Oakland, CA 94609
Phone: (415) 326-3173

Kelly Clark (Bar No. 312251)
Email: kelly@lawaterkeeper.org
LOS ANGELES WATERKEEPER
120 Broadway
Santa Monica, CA 90401
Phone: (310) 394-6162

*Attorneys for Plaintiff*
LOS ANGELES WATERKEEPER

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a California non-profit association,<br><br>Plaintiff,<br><br>v.<br><br>SECURITY PAVING COMPANY, INC., a California corporation,<br><br>Defendant. | Civil Case No.: 2:19-cv-05068<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

LA Waterkeeper ("LA Waterkeeper" or "Plaintiff"), by and through its counsel, hereby alleges:

## I.    JURISDICTION AND VENUE

1.    This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.    On April 10, 2019, LA Waterkeeper issued a 60-day notice letter ("Notice Letter") to Security Paving Company, Inc. ("Defendant"), for a Facility under their control with Waste Discharger Identification Number 4 191026031. The Facility formerly carried WDID 4 19I023737 under a separate entity controlled by the same ownership group and operated by the same management. The Notice Letter informed Defendant of its violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollutant Discharge Elimination System (NPDES) General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ*) ("1997 Permit"), as superseded by Order No. 2014-0057-DWQ and amended by Order No. 2015-0122 – DWQ ("2015 Permit") (collectively, hereinafter referred to as the "Storm Water Permit"), recently amended but not yet adopted Order No. 20XX-XXX-DWQ incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("2018 General Permit"), and the Clean Water Act at the following facility: Security Paving Company, Inc.'s Bradley Avenue Base Facility, 8960 Bradley Avenue, City of Sun Valley, CA 91353 ("the Facility"). The Notice Letter informed Defendant of LA Waterkeeper's intent to file suit against Defendant to enforce the Storm Water Permit and the Clean Water Act.

3.    The Notice Letter was sent to Defendant's current Chief Executive Officer and registered agent for service, Michael Mattivi, Vice President Joe Ferndino, Environmental Compliance Manager Chris Ramer, and Steve Lara the Site Supervisor and General Manager, as required by 40 C.F.R. § 135.2(a)(2). The Notice Letter was also sent to the Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Acting Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Los Angeles Region, ("Regional Board") as required by Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A). The Notice Letter is attached hereto as **Exhibit A** and is incorporated herein by reference.

4.    More than sixty (60) days have passed since the Notice Letter was served on the Defendant and the State and Federal agencies. LA Waterkeeper is informed and believes, and thereon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

5.    Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

## II.    **INTRODUCTION**

6.    With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Facility referenced herein, pour into the storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that stormwater pollution accounts for more than half of the total pollution entering marine and river environments each year. These surface waters, known as Receiving Waters, are ecologically sensitive areas. Although pollution and habitat destruction have drastically diminished once abundant and varied

fisheries, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Stormwater and non-stormwater contain sediment, heavy metals, such as aluminum, iron, chromium, copper, lead, mercury, nickel, and zinc, as well as, high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted stormwater harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in stormwater and non-stormwater discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

7. High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS has been shown to alter predator-prey relationships (for example, turbid water may make it difficult for fish to hunt prey). Deposited solids alter fish habitat, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons ("PAHs"), are absorbed onto TSS. Thus, higher concentrations of TSS result in higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces.

8. Storm water discharged with high pH can damage the gills and skin of aquatic organisms and cause death at levels above 10 standard units. The pH scale is logarithmic and the solubility of a substance varies as a function of the pH of a solution. A one-whole-unit change in SU represents a tenfold increase or decrease in ion concentration. If the pH of water is too high or too low, the aquatic organisms living within it will become stressed or die.

9. This complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert

witness fees, for Defendant's substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from Defendant's operations at the Facility.[1]

10.    LA Waterkeeper specifically alleges violations regarding Defendant's discharge of pollutants from the Facility into waters of the United States; violations of the filing, monitoring and reporting, and best management practice requirements; and violations of other procedural and substantive requirements of the Storm Water Permit and the Clean Water Act, are ongoing and continuous.

## III.    PARTIES

### A.    Los Angeles Waterkeeper

11.    LA Waterkeeper is a non-profit 501(c)(3) public benefit corporation organized under the laws of the State of California. LA Waterkeeper's main office is located at 120 Broadway, Santa Monica, California 90401.

12.    LA Waterkeeper has hundreds of members who live and/or recreate in and around Los Angeles. LA Waterkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of local surface waters. To further these goals, LA Waterkeeper actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and others.

13.    LA Waterkeeper members live, work, travel near, recreate in, use and enjoy the waters near the Facility, including Los Angeles River, Queensway Bay, and Junipero Beach for biking, boating, kayaking, bird watching, riding horses, viewing wildlife, hiking, walking, running, and engaging in scientific study, including monitoring and restoration activities.

14.    LA Waterkeeper engages in research and study throughout the Los Angeles River. LA Waterkeeper monitors the water quality, insect health, physical habitat, and human activity throughout the Los Angeles River including in the Glendale Narrows

---

[1] The Facility is fully described in Section V below.

section, the Arroyo Seco Confluence, Maywood, the Rio Hondo Confluence, the Compton Creek Confluence and upstream from the estuary.

15.    Discharges of polluted storm water and non-storm water from the Facility degrade water quality and harm aquatic life in the Los Angeles River, Queensway Bay, and Junipero Beach, and impair LA Waterkeeper's and its members' use and enjoyment of those waters.

16.    The violations of the Storm Water Permit and Clean Water Act at the Facility are ongoing and continuous, including but not limited to Defendant's discharge of polluted storm water from the Facility. Thus, the interests of LA Waterkeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Storm Water Permit and the Clean Water Act.

17.    Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and its members, for which they have no plain, speedy or adequate remedy at law.

18.    The interests of LA Waterkeeper and LA Waterkeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Storm Water Permit. The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

**B.    The Security Paving Company, Inc.'s Facility Owner and/or Operator**

19.    LA Waterkeeper is informed and believes, and thereon alleges, that Security Paving Company, Inc. maintains its headquarters 13170 Telfair Avenue, Sylmar, CA 91342.

20.    LA Waterkeeper is informed and believes, and thereon alleges, that Defendant is the owner of the Security Paving Company, Inc.

21.    LA Waterkeeper is informed and believes, and thereon alleges, that Defendant is the operator of the Facility.

22.    LA Waterkeeper refers to Defendant and its management herein as the "Owners/Operators" of the Facility.

23.    LA Waterkeeper is informed and believes, and thereon alleges, that Defendant is an active California corporation registered in California.

24.    LA Waterkeeper is informed and believes, and thereon alleges, that the name and address of the Registered Agent for Security Paving Company, Inc. is Michael Mattivi, Chief Executive Officer & Agent for Service of Process, Security Paving Company, Inc., 13170 Telfair Ave, Sylmar, CA 91342.

## IV.    STATUTORY BACKGROUND

### A.    The Clean Water Act

25.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

26.    Section 402(p) of the CWA establishes a framework for regulating municipal and industrial stormwater discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial stormwater discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial stormwater dischargers. 33 U.S.C. § 1342.

27.    Section 301(b) of the Clean Water Act requires that, by March 31, 1989, all point source dischargers, including those discharging polluted stormwater, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

28.    The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. §

122.26(c)(1).

29.    The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

30.    The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

31.    The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.

32.    "Navigable waters" means "the waters of the United States." 33 U.S.C. 1362(7).

33.    "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7).

34.    The EPA promulgated regulations for the Section 402 NPDES permit program defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce.

35.    The Clean Water Act confers jurisdiction over non-navigable waters that are tributaries to traditionally navigable waters where the non-navigable water at issue has a

significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

36.     A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

37.     A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.

38.     Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

39.     The Defendants are "person[s]" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

40.     An action for injunctive relief is authorized under Section 505(a) of the CWA, 33 U.S.C. § 1365(a).

41.     Pursuant to sections 309(d) and 505 of the Clean Water Act, each separate violation of the CWA occurring before November 2, 2015 subjects the violator to a penalty of up to $37,500 per day; violations occurring after November 2, 2015 and assessed on or after January 15, 2018 subjects the violator to a penalty of up to $53,484 per day. *See* 33 U.S.C. §§ 1319(d) and 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

42.     Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

**B.     California's Storm Water Permit**

43.     Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted stormwater. States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial stormwater discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial stormwater dischargers. *See id.*

44.     Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator of the EPA has authorized California to issue NPDES permits, including general NPDES permits. California has designated the State Board and the Regional Water Quality Control Boards to administer its NPDES program. *City of Rancho Cucamonga v. Regional Water Quality Control Bd.*, 135 Cal. App. 4th 1377, 1380-81 (2006). In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

45.     The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1342(b), (p), and 40 C.F.R § 123.25. Violations of the Storm Water Permit are also violations of the CWA. 1997 Permit, Section C(1); 2015 Permit, Section XXI(A).

46.     Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States. The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards. *See* 33 U.S.C. § 1313(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. §§ 122.44(D)(1).

47.     The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the Storm Water Permit on or about November 19, 1991, modified the Storm Water Permit on or about September 17, 1992, and reissued the Storm Water Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean

Water Act, 33 U.S.C. § 1342(p).

48.    On July 1, 2015 the 2015 Permit became effective and was issued as NPDES General Permit No. CAS000001 (the same NPDES permit number as the 1997 Permit). 2015 Permit, Section I(A) (Finding 4). The 2015 Permit superseded the 1997 Permit except for enforcement purposes. *Id.* at Section I(A) (Finding 6). The substantive requirements of the 2015 Permit are the same or more stringent than the requirements of 1997 Permit.

49.    On November 6, 2018, the State Board issued an amended but not yet adopted Order No. 20XX-XXX-DWQ, incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("2018 Permit").

50.    In order to discharge stormwater lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit. 1997 Permit, p. II-V; 2015 Permit, Section I(A) (Findings 8, 12). Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *See* 1997 Permit, Provision E(1), Finding 3; 2015 Permit, Section I(A) (Finding 17), Section II(B).

51.    Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation."  *See* 33 U.S.C. §§ 1365(a)(i), 1365(f).

### C.     The Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations

52.     The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than stormwater ("non-stormwater discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. 1997 Permit, Discharge Prohibition A(1); 2015 Permit, Discharge Prohibition III(B).

53.     Effluent Limitation (B)(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in stormwater discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand ("BOD"), TSS, oil and grease ("O&G"), pH, and fecal coliform.

54.     Discharge Prohibition (A)(2) of the 1997 Permit and Discharge Prohibition III(C) of the 2015 Permit prohibits stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance.

55.     Under the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate stormwater pollution. 33 U.S.C. § 1311(b); 1997 Permit, Effluent Limitation B(3); 2015 Permit, Effluent Limitation V(A). EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. *See* Final National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges From Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector Permit, 73

Fed. Reg. 56,572, 56,574 (Sept. 29, 2008; Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

56.    The EPA established Parameter Benchmark Values for the following parameters, among others, are as follows: Total Suspended Solids—100 mg/L; Oil & Grease—15 mg/L; Aluminum – .75 mg/l; Iron—1 mg/l; Lead—.069 mg/l; Copper—.0123 mg/l; Zinc—.11 mg/L; and pH—6-9 s.u. The Basin Plan's Water Quality Standards for the Los Angeles Region requires a narrower pH range of 6.5—8.5 pH units. The 2015 Permit contains Numeric Action Levels ("NALs") for these same parameters that generally mirror the Benchmark Values.

57.    The 2015 Permit includes NALs. 2015 Permit, Section I(M) (Finding 62). During the public commenting period, the State Board stated that "NALs are not designed or intended to function as numeric technology-based effluent limitations." State Board 2012 Draft Industrial General Permit Response to Comments, Response #6 to Comment #12; *see also* 2015 Permit Section I(M) (Finding 63).

58.    Receiving Water Limitation C(1) of the 1997 Permit and Receiving Water Limitation VI(B) of the 2015 Permit prohibit stormwater discharges from adversely impacting human health or the environment.

59.    Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the Storm Water Permit's Receiving Water Limitation.

60.    Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) of the 2015 Permit prohibit stormwater discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

61.    Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various Regional Boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

62.    The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan which contains WQS for water bodies within its geographic area.

63.    The State Water Quality Control Board, Los Angeles Region, has issued the Water Quality Control Plan for the Los Angeles Region ("the Basin Plan") to establish water quality objectives, implementation plans for point and non-point source discharges, prohibitions, and to further statewide plans and policies. The Basin Plan sets forth water quality objectives for dissolved metals such as aluminum, arsenic, and mercury. Basin Plan, Table 3.8. The Basin Plan states that the waters shall not receive sediment, settleable materials, or suspended materials that cause nuisance or adversely affect the waters' beneficial uses. *Id*. at 3-27. The Basin Plan also provides that "Toxic pollutants shall not be present at levels that will bioaccumulate in aquatic life to levels which are harmful to aquatic life or human health." *Id*. at 3-24.

64.    The Basin Plan specifies potential beneficial uses for Burbank Western Channel including municipal and domestic supply, warm freshwater habitat, and wildlife habitat. Basin Plan, Table 2-1. The Basin Plan further specifies potential and existing beneficial uses for Los Angeles River Reach 3 including municipal and domestic supply, industrial and service supply, groundwater recharge, warm freshwater habitat, wildlife habitat, and wetland habitat. *Id.* The Basin Plan further specifies beneficial uses for the Los Angeles River Estuary, at Queensway Bay, including rare, threatened, or endangered species ("RARE"). Basin Plan, Table 2-1 and 2-3. Present and potential beneficial uses for the Los Angeles River Estuary include but are not limited to, industrial service supply, navigation, commercial and sport fishing, estuarine habitat, marine habitat, wildlife habitat, migration of aquatic organisms, spawning, reproduction, and/or early development, shellfish harvesting, and wetland habitat. *Id.*

65.    Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act.

66.     Reach 3 of the Los Angeles River is listed for the following water quality impairments on the most recent Clean Water Act Section 303(d)-list: Copper, Ammonia, Indicator Bacteria, Algae, Toxicity, and Trash. Downstream stretches of the Los Angeles River have further differing impairments listed on the 303(d)-impairment list including lead, cadmium, cyanide, and oil. The Burbank Western Channel is 303(d)-list impaired for Copper, Cyanide, Indicator Bacteria, Lead, Selenium and Trash. Queensway Bay is 303(d)-list impaired for Chlordane, Toxicity and Trash. Thus, the receiving waters for pollution from the Facility are impaired, and the Defendant's illegal discharges of pollutants above the WQS contributes to the continued impairment of the receiving waters' beneficial uses.

67.     In addition, EPA has promulgated WQS for toxic priority pollutants in all California water bodies ("California Toxics Rule" or "CTR"), which apply to the Receiving Waters, unless expressly superseded by the Basin Plan. 65 Fed. Reg. 31,682 (May 18, 2000); 40 C.F.R. § 131.38.

68.     The CTR sets forth lower numeric limits for zinc and other pollutants; CTR criteria can be as low as 0.067 mg/L for zinc in freshwater surface waters with water hardness calculation of 50 mg/L.[2]

69.     The CTR includes further numeric criteria set to protect human health and the environment in the State of California. *See* Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at: https://www.epa.gov/wqs-tech/water-quality-standards-establishment-numeric-criteria-priority-toxic-pollutants-state.

70.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of Receiving Water Limitation C(2) of the 1997 Permit and Section VI(A) of the 2015 Permit.

---

[2] The CTR numeric limits, or "criteria," are expressed as dissolved metal concentrations in the CTR, but the Storm Water Permit required permittees to report their sample results as total metal concentrations. *See* 1997 Permit § B(10)(b); 2015 Permit, Attachment H at 18.

Complaint for Declaratory and Injunctive    15
and Civil Penalties Relief

71.     Receiving Water Limitations C(3) and C(4) of the 1997 Permit require a permittee whose discharges exceed the Storm Water Permit's Receiving Water Limitations to submit a written report identifying what additional BMPs will be implemented to achieve water quality standards.

**D.    The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements**

72.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. 1997 Permit, Section A(1)(a) and E(2); 2015 Permit, Sections I(I) (Finding 54), X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater and authorized non-stormwater discharges from the facility. 1997 Permit, Section A(2); 2015 Permit, Section X(G). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater and authorized non-stormwater discharges from the facility. 1997 Permit, Section A(2); 2015 Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in stormwater and authorized non-stormwater discharges. 1997 Permit, Section A(2); 2015 Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. 1997 Permit, Order Section A(2); 2015 Permit, Section I(D) (Finding 32), Section X(C).

73.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the stormwater conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of stormwater management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in stormwater discharges and authorized non-stormwater discharges; the identification and elimination of non-stormwater discharges; the location

where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and its current responsibilities for developing and implementing the SWPPP. 1997 Permit, Section A(1)-(10); 2015 Permit, Section X.

74.    The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to stormwater, and to reduce or prevent the discharge of polluted stormwater from industrial Facility. 1997 Permit, Section A(2); 2015 Permit, Section X.

75.    The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. 1997 Permit, Section A(9); 2015 Permit, Section X(A)(9). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports, and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. 1997 Permit, Sections A(9)(a)-(c); 2015 Permit, Section XV.

76.    Section A(9)(d) of the 1997 Permit requires that the discharger submit an evaluation report that includes an identification of personnel performing the evaluation, the date(s) of the evaluation(s), necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the discharger is in compliance with the Storm Water Permit. Storm Water Permit, Section A(9)(d)(i)-(vi). If certification of compliance cannot be provided, the discharger must explain in the evaluation report why the facility is not in compliance

with the Storm Water Permit. *Id.*, Section A(9)(d). The evaluation report shall be submitted as part of the Annual Report specified in Section B(14) of the Storm Water Permit. *Id.*

77.     The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. 1997 Permit, Sections A(1), B(3)-(4); 2015 Permit, Sections I(J) (Finding 55), X(B)(1). Significant SWPPP revisions must be certified and submitted by the discharger via SMARTS within 30 days. 2015 Permit, Section X(B)(2). Dischargers are required to submit revisions to the SWPPP that are determined to not be significant every three (3) months in the reporting year. *Id.* at Section X(B)(3); 2015 Permit, Fact Sheet, Section II (I)(1).

**E.     The Storm Water Permit's Monitoring and Reporting Requirements**

78.     The 1997 Permit required facility operators to develop and implement a monitoring and reporting plan ("M&RP") when industrial activities begin at a facility. 1997 Permit, Sections B(1)-(2) and E(3). The M&RP must have ensured that stormwater discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the 1997 Permit. *Id.* at Section B(2). The M&RP must have ensured that practices at the facility to prevent or reduce pollutants in stormwater and authorized non-stormwater discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. *Id.*

79.     The objectives of the M&RP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that stormwater and non-stormwater discharges are in compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 1997 Permit, Sections B(2)(a) and B(2)(b); 2015 Permit, Section XI.

80.     The M&RP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in stormwater discharges. *Id.*, 1997 Permit Section B(2)(c) and B(2)(d).

81.    The 2015 Permit requires facility operators to monitor and sample stormwater discharges to ensure that the facility is complying with the terms of the permit. 2015 Permit, Sections I(J) (Findings 55-56) and XI.

82.    Section B(2)(d) of the 1997 Permit and Section XI(A)(4) of the 2015 Permit require that the M&RP shall be revised as necessary to ensure compliance with the Storm Water Permit.

83.    Section B(4)(a) of the 1997 Permit and Section XI(A) of the 2015 Permit require dischargers to conduct monthly visual observations of stormwater discharges.

84.    Section B(4)(c) of the 1997 Permit and Section XI(A)(2) of the 2015 Permit requires dischargers to document the presence of any floating and suspended materials, O&G, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in stormwater discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting stormwater discharges. *See* 1997 Permit, Section B(4)(c); 2015 Permit, Section XI(A)(3). The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. 1997 Permit, Section B(4)(c); 2015 Permit, Section X(B)(1).

85.    The Storm Water Permit requires dischargers to visually observe and collect samples of stormwater discharges from all locations where stormwater is discharged. 1997 Permit, Sections B(5) and B(7); 2015 Permit Section XI(B)(4).

86.    Section B(5)(a) of the 1997 Permit requires dischargers to collect stormwater samples during the first hour of discharge from the first storm event of the Wet Season and at least one other storm event in the Wet Season. All stormwater discharge locations must be sampled. Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events of the Wet Season and must explain in the Annual Report why the first storm event was not sampled.

87.    Section B(5)(b) of the 1997 Permit requires that sampling conducted
pursuant to the Storm Water Permit occur during scheduled facility operating hours that
are preceded by at least three (3) working days without stormwater discharge.

88.    Section B(5)(c)(i) of the 1997 Permit requires dischargers to analyze each
sample for pH, specific conductance ("SC"), TSS, and total organic carbon ("TOC"). A
discharger may substitute analysis for O&G instead of TOC.

89.    Section B(5)(c)(ii) of the 1997 Permit requires dischargers to analyze each
sample for toxic chemicals and other pollutants likely to be present in significant
quantities in the stormwater discharged from the facility.

90.    Section B(14) of the 1997 Permit requires that dischargers submit an Annual
Report to the applicable Regional Board by July 1 of each year. The Annual Report must
include a summary of visual observations and sampling results, an evaluation of the
visual observations and sampling and analysis results, laboratory reports, the annual
comprehensive site compliance evaluation report specified in Section A(9), an
explanation of why a facility did not implement any activities required, and the records
specified in Section B(13)(i).

91.    Section B(15)(f) of the 1997 Permit requires that sampling and analysis be
performed according to Section B of the 1997 Permit.

92.    Section XI(B)(1) of the 2015 Permit requires sampling if a precipitation
event produces a discharge for at least one drainage area, and it is preceded by forty-eight
(48) hours with no discharge from any drainage area ("Qualifying Storm Event" or
"QSE").

93.    Section XI(B)(2) of the 2015 Permit requires dischargers to collect and
analyze stormwater samples from two (2) QSEs within the first half of each reporting
year (July 1 to December 31), and two (2) QSEs within the second half of each reporting
year (January 1 to June 30).

94.    Section XI(B)(6) of the 2015 Permit requires dischargers to analyze
stormwater samples for TSS, O&G, pH, additional parameters identified by the

Complaint for Declaratory and Injunctive    20
and Civil Penalties Relief

discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs, and additional parameters required by the Regional Water Board.

95.    The Facility's May 2015 SWPPP requires testing for pH, TSS, O&G, and iron.

96.    Section XVI of the 2015 Permit requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a Discharger complies with, and has addressed all applicable requirements of this General Permit, an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

## V.    STATEMENT OF FACTS

### A. The Security Paving Company, Inc. Facility Site Description

97.    The Facility is located at 8960 Bradley Avenue, Sun Valley, California, and consists of approximately 5.5 acres. The Facility's general purpose consists of cement and concrete batching, mixing, delivery of product, and concrete/aggregate reuse and recycling. Industrial operations and activities at the Facility consist of storing aggregate base and both concrete and asphalt rubble. Aggregate base is generated from crushing the rubble onsite and sold for use in construction projects. Industrial activities occurring at the Facility include storage of raw and "finished" materials, crushing raw materials to create aggregate base, weighing raw materials and finished aggregate base, conveyance and storage of materials via conveyors and hoppers, vehicle loading and unloading, other vehicle and equipment use, vehicle and equipment storage, fueling, and waste storage.

98.    The Facility operates Monday through Friday 6:00 AM to 3:00 PM Monday through Friday, and Saturdays 7:00 AM to 3:00 PM. The Facility's most recent SWPPP notes that these operating hours exclude days of inclement weather and that variations in

actual operating hours may occur as necessary on days of inclement weather.

99.    The Facility's NOI and the Facility's current SWPPP, both obtained from the State Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") establish that Defendant operates under Standard Industrial Classification ("SIC") Code 3295—Minerals and Earths, Ground or Otherwise Treated.

100.    Under SIC Code 3295, the General Permit requires Security Paving to analyze storm water samples for Total Suspended Solids ("TSS"), pH, Oil and Grease ("O&G"), and Iron ("Fe"). Facilities must also sample and analyze for additional parameters identified on a facility-specific basis to reflect the Facility pollutant source assessment, as required by the 2015 General Permit and the Regional Board, and additional parameters related to receiving waters with 303(d) listed impairments. 1997 General Permit, Section B.5.c.i; 2015 General Permit, Section XI.B.6.

101.    LA Waterkeeper is informed and believes, and thereon alleges, that the Facility discharges industrial stormwater pursuant to the General Permit through at least one discharge point. Very little information is available in the Facility SWPPP as regards to the receiving waters or the municipal storm drain system. The Facility NOI left the receiving water subsection blank while the Facility SWPPP and Site Map describe the Burbank Western Channel as the closest receiving water body. The Burbank Western Channel flows into the Los Angeles River and ultimately the river estuary Queensway Bay at Junipero Beach in Long Beach, effectively the Pacific Ocean.

102.    Burbank Western Channel, the Los Angeles River, and Queensway Bay are waters of the United States within the meaning of the CWA, and which, on information and belief, receive discharged effluent from the Facility.

103.    LA Waterkeeper is informed and believes, and thereon alleges, that industrial activities at the Facility occur in the following industrial areas, among others: material storage areas and paved and stabilized storage areas, including a rubble stockpile area and an aggregate base stockpile area, loading and unloading areas, waste and bin storage areas, material crushing areas, driveways, equipment parking areas and fueling

areas. All 5.5 acres of the site host industrial activities and are directly exposed to precipitation and storm water runoff.

104.    LA Waterkeeper is informed and believes, and thereon alleges that pollutant sources on site at the Facility include but are not limited to, hydraulic fluids, petroleum and oils, industrial debris, facility wide sediment buildup, fluids from operations, equipment and storage. Dust and fine particles from operations throughout the site collect on surfaces, pavement, unpaved areas, vehicles and equipment, and are deposited throughout the Facility. Vehicles, hoppers and conveyors carry and disturb materials, dust, fine particles and debris from the Facility to other areas onsite. Dust and fine particles are also deposited offsite through aerial deposition where it may later contact storm water and enter the Receiving Waters.

105.    The Facility is said to be twenty percent paved with the remaining eighty percent covered with aggregate base. The Facility appears not to be divided into distinct drainage areas. According to the Facility SWPPP, storm water from the Facility flows off the paved areas and surface flows towards the south with water ponding at the south corner prior to discharge offsite through a single point, the main entrance and exit driveway. LA Waterkeeper is also informed and believes that storm water also leached from base aggregate and raw materials stores which joins the flow. Storm water discharged from the Facility then flows southeast down Bradley Ave. to the north corner of Bradley Avenue and Tuxford Street and enter the City of Los Angeles' Separate Storm Sewer System ("MS4") through a storm drain inlet which discharges to the Burbank Western Channel which flows to the Los Angeles River. LA Waterkeeper is also informed and believes that fugitive storm water discharges from the Facility from borders throughout the site and also enters the MS4 system.

106.    LA Waterkeeper is informed and believes, and thereon alleges that heavy use of water at the Facility for equipment and vehicle washing, dust control, and in the industrial processes increases the likelihood of polluted storm water discharged and non-storm water discharges.

**B. Burbank Western Channel/ Los Angeles River/ Queensway Bay**

107.   Burbank Western Channel is a 6.3-mile concrete flood control channel running between the Sun Valley and Burbank, California, where it joins the Los Angeles River.

108.   LA Waterkeeper and its member utilize the Los Angeles River for research, study, and recreation.  LA Waterkeeper monitors the water quality, insect populations, and habitat at multiple locations in the Los Angeles River.

109.   The Los Angeles River provides critical habitat for species, including many that are endangered, threatened, rare, and endemic to Southern California. The concrete-lined sections provide wading habitat for shorebirds that have few other options, given that the majority of Los Angeles' wetlands have been destroyed. The Los Angeles River estuary provides a rich brackish habitat at the intersection of freshwater and saltwater environments. These river reaches support endangered species, including the Least bell's vireo, Western yellow-billed cuckoo, Willow flycatcher, and Tri-colored blackbird. They also support species of special concern, such as the Santa Ana sucker, arroyo chub, California brown pelican, yellow-breasted chat, long-billed curlew, bank swallow, and the California red-legged frog. These habitats remain vulnerable, however. Past habitat destruction and pollution have led to the extirpation of many species, including the western pond turtle and the steelhead trout, and many species listed here are likely to be extirpated in the near future.

110.   Queensway Bay is the outlet for the Los Angeles River, at Junipero Beach, located in Long Beach. The surrounding area was formerly wetlands but is now heavily developed and contains a marina, restaurants, and businesses. Ample recreational opportunities exist in and around the bay, including water contact sports such as kayaking, sailing, stand-up paddle boarding, rowing, and jet skiing, and other activities such as walking, bicycling, boating. The bay provides habitat for an abundant variety of aquatic and bird species and other wildlife.

### C. The Facility Storm Water Permit Coverage

111.   LA Waterkeeper is informed and believes, and thereon alleges, that a separate entity controlled by the same ownership group and operated by the same management as Defendant submitted an NOI for coverage for the Facility under the 1997 Permit. The Facility also formerly carried WDID 4 19I023737 under the 2015 Permit through a separate entity controlled by the same ownership group and operated by the same management.

112.   The State Board's electronic database, called the Storm Water Multiple Application & Report Tracking System ("SMARTS"), lists the current Facility Waste Discharge Identification ("WDID") number as 4 191026031. SMARTS lists the Facility's coverage under the Storm Water Permit as "Active."

113.   The NOI for the Facility left blank the subsection on receiving water.

114.   Via search of the SMARTS database, LA Waterkeeper obtained a SWPPP for the Facility dated May 2015 ("Facility SWPPP").

115.   LA Waterkeeper is informed and believes, and thereon alleges, that the Facility's SWPPP fails to describe and/or adequately describe all of the Facility's industrial activities or processes.

116.   LA Waterkeeper is informed and believes, and thereon alleges, that because the Facility's SWPPP fails to describe and/or adequately describe all of the Facility industrial activities, the Facility's SWPPP also fails to describe and/or adequately describe all of the significant materials and processes that are related to the Facility's industrial activities.

117.   LA Waterkeeper is informed and believes, and thereon alleges, that pollutants associated with the Facility include, but are not limited to: pH-affecting substances; metals, such as iron; toxic metals, such as zinc, lead, and copper; TSS; nitrate + nitrite nitrogen; and Chemical Oxygen Demand ("COD").

118.   LA Waterkeeper is informed and believes, and thereon alleges, that without properly identifying all industrial activities or all significant materials at the Facility in

the SWPPP, the Owners/Operators have not developed and/or implemented all appropriate BMPs.

119.   LA Waterkeeper is informed and believes, and thereon alleges, that the Facility SWPPP failed to implement the minimum BMPs required by the General Permit, including: sufficient good housekeeping requirements; preventive maintenance requirements; aerial deposition control; material handling and waste management requirements; erosion and sediment controls; employee training and quality assurance; and record keeping.

120.   LA Waterkeeper is informed and believes, and thereon alleges that the Facility SWPPP contains only a boilerplate list of minimum BMPs noting that each is "ongoing."

121.   LA Waterkeeper is informed and believes, and thereon alleges that Security Paving has further failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with the General Permit's effluent limitations consistent with Section A of the 1997 Permit, and Section X of the 2015 Permit.

122.   LA Waterkeeper is informed and believes, and thereon alleges that there are no advanced BMPs implemented or planned for implementation, pursuant to the SWPPP.

123.   LA Waterkeeper is informed and believes, and thereon alleges, that Owners/Operators have failed and continue to fail to develop the Facility SWPPP and site-specific BMPs consistent with Section A of the 1997 Permit, and Section X of the 2015 Permit.

124.   LA Waterkeeper is informed and believes that the Owners/Operators of the Facility rely on the SWPPP's statement that operating hours exclude days of inclement weather and that variations in actual operating hours may occur as necessary on days of inclement weather to avoid required storm water sampling all together. The Facility

Owners/Operators have not submitted any storm water sample analysis to the Regional Board since their submission of the Notice of Intent to comply with the 2015 General Permit for the Facility, despite evidence of nearby facilities having experienced precipitation sufficient to trigger sampling requirements and sufficient rain events tracked at the Hollywood Burbank Airport. During this reporting[3] year alone, LA Waterkeeper identified twenty-five (25) rain events of over 0.1 inches. Notably, Security Paving did not submit any storm water sample analysis to the Regional board under the former WDID when the Facility was owned and operated by a separate Limited Liability Company under the same Owners/Operators.

125.   LA Waterkeeper is informed and believes, and thereon alleges, that Defendant has refused to collect storm water samples for analyses, in violation of the General Permit, since at least April 10, 2014. LA Waterkeeper was able to collect storm water samples on January 31, 2019 during a rain event in which witnesses observed the Facility fully operating. As further detailed below, these results found exceedances of zinc, copper, lead, nitrate + nitrite nitrogen ,  TSS, and COD above the Benchmark Level.

126.   LA Waterkeeper is informed and believes, and thereon alleges that LA Waterkeeper's sample results demonstrate violations of the General Permit's discharge prohibitions, receiving water limitations, and effluent limitations set forth above. LA Waterkeeper is informed and believes that the Defendant has known that its storm water contains pollutants at levels exceeding General Permit standards since at least April 10, 2014.

127.   LA Waterkeeper is informed and believes, and thereon alleges that violations of TSS, lead, BMP, copper, zinc, COD, iron and pH occur each time storm water or non-storm water discharges from the Facility, in violation of the 1997 General Permit, Discharge Prohibition A.2, Receiving Water Limitations C.1 and C.2, and  2015 General Permit, Discharge Prohibitions III.C and III.D, Receiving Water Limitations

---

[3] A reporting year under the General Permit runs from July 1 to June 30.

VI.A, VI.B.

128.   LA Waterkeeper is informed and believes, and thereon alleges that the repeated and significant exceedances of Benchmark Levels demonstrate that the Owners/Operators have failed and continue to fail to develop and/or implement BMPs to prevent the exposure of pollutants to stormwater and to prevent discharges of polluted stormwater and non-stormwater from the Facility.

129.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to evaluate the effectiveness of its BMPs and adequately revise the Facility SWPPP, despite repeated and significant concentrations of pollutants in the Facility's stormwater discharges. Defendant has failed to make changes to the Facility's training programs, or make any other changes based upon events that would signal a need for required revisions or alteration of practices.

130.   LA Waterkeeper is informed and believes, and thereon alleges, that pollutants, including but not limited to those referenced herein, have been and continue to be tracked throughout the Facility's operation areas.

131.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners'/Operators' failure to properly address pollutant sources and pollutants results in the exposure of pollutants associated with its industrial activities to precipitation, and that this results in discharges of polluted stormwater from the Facility and into local waterways in violation of the Storm Water Permit and/or the Clean Water Act.

132.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners'/Operators' failure to properly address these pollutants and its sources results in the exposure of pollutants to precipitation, which carries these pollutants with stormwater flows from the Facility into Burbank Western Channel, Los Angeles River, and Queensway Bay.

**D. Stormwater Discharges at the Facility**

133.   The Owners/Operators represent that there is one discharge point at the Facility from which they have not sampled storm water. The Facility SWPPP, which was

last updated in May of 2015, notes that storm water from the Facility flows off paved areas and surface flows towards the south with water ponding at the south corner prior to discharge offsite through a single point, the main entrance and exit driveway.

134.   LA Waterkeeper is also informed and believes that other discharge points exist at the borders of the Facility and that storm water flows through, leaches and drains from base aggregate and raw material piles and eventually discharges from the Facility.

135.   LA Waterkeeper obtained storm water samples from a Facility discharge on January 31, 2019 and analyses of the discharge showed concentrations of TSS at 3600 mg/L, COD at 1700 mg/L, zinc at 2 mg/L, copper at 0.42 mg/L, lead at 0.45 mg/L, and nitrate + nitrite nitrogen at 2.9 mg/L. Each sample result was a significant multiple over the Benchmark values established by the EPA.

### E.  The Facility's Stormwater Discharges to the Receiving Waters Contain Elevated Levels of Pollutants

136.   LA Waterkeeper is informed and believes, and thereon alleges, that pollutants from the Facility discharge from at least one discharge point into Burbank Western Channel, Los Angeles River, and Queensway Bay.

137.   The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. The CWA requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. 40 C.F.R. § 122.21.

138.   LA Waterkeeper is informed and believes, and thereon alleges, Burbank Western Channel, Los Angeles River, and Queensway Bay, the Receiving Waters herein, are waters of the United States, and/or a tributary to a traditionally navigable water.

139.   LA Waterkeeper is informed and believes, and thereon alleges, that polluted stormwater and non-stormwater discharges from the Facility to the Receiving Waters.

140.   Stormwater discharges containing pollutants, including but not limited to, heavy metals such as zinc, iron, and copper adversely affect the aquatic environment.

141.   Samples of stormwater discharges collected at the Facility contain pollutants including zinc, copper, lead, nitrate + nitrite, TSS, COD, in excess of levels known to adversely impact aquatic species and the environment, federal regulations, WQS, Benchmarks, and the CTR in violation of the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

142.   LA Waterkeeper is informed and believes, and thereon alleges, that during and/or after every significant rain event[4] or any other stormwater or non-stormwater discharge that has occurred at the Facility since April 10, 2014, through the present, Defendant has discharged and continues to discharge stormwater and non-stormwater from the Facility that contains concentrations of pollutants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit, the Federal Effluent Limitations, the Benchmarks, CTR, and the WQS.

### F.   Defendant's Failure to Comply with the Storm Water Permit's Sampling, Reporting, and Monitoring Requirements

143.   LA Waterkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to develop an adequate M&RP for industrial operations at the Facility that complies with Section B of the 1997 Permit, and Section XI of the 2015 Permit.

144.   LA Waterkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to revise the M&RP for the Facility as necessary to ensure compliance with the 1997 Permit, in violation of Section B(2)(d), and Section XI of the 2015 Permit.

---

[4] A significant rain event is an event that produces stormwater runoff, which according to EPA occurs with more than 0.1 inches of precipitation.

145.   LA Waterkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to collect or analyze any stormwater samples at the Facility, in violation of Section B and Provision E(3) of the 1997 Permit and Section XI of the 2015 Permit.

146.   LA Waterkeeper is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to sample stormwater discharges from all discharge locations, in violation of Section B(7) of the 1997 Permit and Sections XI(B) and XI(C) of the 2015 Permit.

147.   LA Waterkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to adequately revise the M&RP for the Facility as necessary to ensure compliance with the Storm Water Permit in violation of Sections A(9) and A(10) of 1997 Permit and Sections XI(B) and XI(C) of the 2015 Permit.

148.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners/Operators of the Facility consistently fail to perform visual observations of stormwater during QSEs.

149.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners/Operators of the Facility have consistently failed and continue to fail to report any noncompliance with the Storm Water Permit at the time that the Annual Report is submitted, including: 1) a description of the noncompliance and its cause, 2) the period of noncompliance, 3) if the noncompliance has not been corrected, the anticipated time it is expected to continue, and 4) steps taken or planned to reduce and prevent recurrence of the noncompliance as required by the 1997 Permit, Section C(11)(d).

150.   LA Waterkeeper is informed and believes, and thereon alleges, that Defendant's certifications of compliance with the 1997 Permit in each of its past five (5) Annual Reports, provided the Annual Reports were in fact submitted, were erroneous because Defendant have not developed and/or implemented the required BMPs, or revised the SWPPP or the M&RP, as required by Sections A and B of the 1997 Permit.

151.   LA Waterkeeper is informed and believes, and thereon alleges, that the

Owners/Operators of the Facility consistently fail to collect stormwater samples during QSEs.

152.   LA Waterkeeper is informed and believes, and thereon alleges, that Defendant have failed to submit complete Annual Reports to the Regional Board in violation of Section B(14) of the 1997 Permit, and Section XVI of the 2015 General Permit.

153.   LA Waterkeeper is informed and believes, and thereon alleges that Defendant failed to submit reports required by Receiving Water Limitations C(3) and (C)(4) of the 1997 General Permit.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Discharges of Contaminated Stormwater in Violation of
the Storm Water Permit's Effluent Limitations and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

154.   LA Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

155.   LA Waterkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

156.   LA Waterkeeper is informed and believes, and thereon alleges, that discharges of stormwater containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time stormwater discharges from the Facility. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the CWA. *See* 1997 Permit, Effluent Limitation B(3); 2015 Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

157.   The Owners/Operators violate and will continue to violate the Storm Water Permit's Effluent Limitations each and every time stormwater containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

158.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners'/Operators' violations of Effluent Limitations of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

159.   Each day since at least April 10, 2014 that the Owners/Operators discharge stormwater containing pollutants in violation of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

160.   By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from April 10, 2014 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

161.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm LA Waterkeeper has no plain, speedy, or adequate remedy at law.

162.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## SECOND CAUSE OF ACTION
### Defendant's Discharges of Contaminated Stormwater in Violation of the Storm Water Permit's Receiving Water Limitations and the Clean Water Act. 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

163.   LA Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

164.   LA Waterkeeper is informed and believes, and thereon alleges, that

discharges of stormwater containing levels of pollutants that adversely impact human health and/or the environment from the Facility occur each time stormwater discharges from the Facility.

165. LA Waterkeeper is informed and believes, and thereon alleges, that stormwater containing levels of pollutants that cause or contribute to exceedances of water quality standards has discharged and continues to discharge from the Facility each time stormwater discharges from the Facility.

166. The Owners/Operators violate and will continue to violate the Storm Water Permit's Receiving Water Limitations each and every time stormwater containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS, discharges from the Facility.

167. LA Waterkeeper is informed and believes, and thereon alleges, that the Owners'/Operators' violations of Receiving Water Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

168. Each and every violation of the Storm Water Permits' Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

169. By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from April 10, 2014 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

170. An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

171. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### THIRD CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollutant Prevention Plan in Violation of the Storm Water Permit and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

172. LA Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

173. LA Waterkeeper is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate SWPPP for the Facility, in violation of the Storm Water Permit.

174. LA Waterkeeper is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement a SWPPP for the Facility, in violation of the Storm Water Permit.

175. LA Waterkeeper is informed and believes, and thereon alleges, that Owners/Operators have failed and continue to fail to adequately revise a SWPPP for the Facility, in violation of the Storm Water Permit.

176. The Owners/Operators have been in violation of the Storm Water Permit at the Facility every day from April 10, 2014 to the present.

177. The Owners'/Operators' violations of the Storm Water Permit and the CWA at the Facility are ongoing and continuous.

178. The Owners/Operators will continue to be in violation of the Storm Water Permit and the CWA each and every day the Owners/Operators fail to adequately develop, implement, and/or revise the SWPPP for the Facility.

179. Each and every violation of the Storm Water Permit's SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

180. By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA

occurring from April 20, 2014 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

181.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

182.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## FOURTH CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or Revise a Monitoring and Reporting Plan in Violation of the Storm Water Permit and the Clean Water Act. U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

183.   LA Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

184.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate M&RP for the Facility, in violation of the Storm Water Permit.

185.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement an M&RP for the Facility, in violation of the Storm Water Permit.

186.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately revise an M&RP for the Facility, in violation of the Storm Water Permit.

187.   The Owners/Operators have been in violation of the Storm Water Permit's monitoring requirements at the Facility every day from April 10, 2014 to the present.

188.   The Owners'/Operators' violations of its Storm Water Permit's monitoring requirements and the CWA at the Facility are ongoing and continuous.

189.   The Owners/Operators will continue to be in violation of Section B and Provision E(3) of the 1997 Permit, Section XI of the 2015 Permit, and the CWA each and every day they fail to adequately develop, implement, and/or revise an M&RP for the Facility.

190.   Each and every violation of the Storm Water Permit's M&RP requirements at the Facility is a separate and distinct violation of the CWA.

191.   By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from April 10, 2014 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

192.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

193.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties. WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### FIFTH CAUSE OF ACTION
**Defendant's Failure to Report as Required by the Storm Water Permit in Violation of the Storm Water Permit and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

194.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

195.   Section XI(B)(2) of the 2015 Permit requires a discharger to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting

year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30). Dischargers are required to submit the storm water sample analyses to the State Board and Regional Board.

196.    Section XI(B)(6) of the 2015 Permit requires dischargers to analyze stormwater samples for TSS, O&G, pH, additional parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs, and additional parameters required by the Regional Board.

197.    Section XVI of the 2015 Permit requires a discharger to certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS and include: 1)  a compliance checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of this General Permit; 2) an explanation for any non-compliance of requirements within the reporting year, as indicated in the compliance checklist; and an identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year.

198.    Section XII(C) of the 2015 Permit requires a discharger to execute a Level 1 Exceedance Response Actions ("ERA") Evaluation and prepare a Level 1 ERA Report should they exceed a Numeric Action Level ("NAL") for any required sampling and analysis parameter under the 2015 Permit, or a Level 2 ERA and prepare a Level 2 ERA Report should they exceed a NAL for two consecutive two consecutive reporting years, for any required sampling and analysis parameter under the 2015 Permit The ERA Evaluation should identify additional BMPs and SWPPP revisions needed to prevent future NAL exceedances and comply with the 2015 Permit. Based upon the ERA Evaluation(s), the discharger shall as soon as practicable, but not later than January 1, shall submit an ERA Report and certify that the ERA Report includes: 1) a summary of the ERA Evaluation, 2) a detailed description of the SWPPP revisions and any additional

BMPs for each parameter that exceeded a NAL. Level 2 ERA reports require more stringent requirements than a Level 1 ERA report.

199.   LA Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners/Operators have failed and continue to fail to sample and analyze storm water in any reporting year under a claim that the Facility ceases operations during rain events. *See* Exhibit A and exhibit to same.

200.   LA Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners/Operators have failed and continue to fail to submit accurate Annual Reports to the Regional Board, in violation of Sections XI and XVI of the 2015 Permit.

201.   LA Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners/Operators failed and continue to fail to submit any ERA Reports to the Regional Board for the Facility, despite a high likelihood that storm water sample analysis would have required ERA Reporting and Facility BMP upgrades, in violation of Section XII(C) of the 2015 Permit.

202.   LA Waterkeeper is informed and believes, and thereon alleges, that the Facility Owners'/Operators' Annual Reports failed and continue to fail to meet the monitoring and reporting requirements of the Storm Water Permit, in violation of Section B(14) of the 1997 Permit and Sections XI and XVI of the 2015 Permit.

203.   LA Waterkeeper is informed and believes, and thereon alleges, that the Owners/Operators of the Facility have failed and continue to fail to submit complete Annual Reports to the Regional Board, in violation of Sections XI and XVI of the 2015 Permit.

204.   The Facility Owners/Operators have been in violation of Sections XI, XII and XVI of the 2015 Permit since July 1, 2015.

205.   The Facility Owners/Operators have been in violation of the reporting requirements of the Storm Water Permit each day it has operated the Facility without reporting as required by Receiving Water Limitations C(3) and C(4) of the 1997 Permit, and Sections XI, XII(C) and XVI of the 2015 Permit.

206.   The Owners/Operators have been in violation of Sections XI, XII(C) and XVI of the 2015 Permit since at July 1, 2015.

207.   The Owners'/Operators' violations of the reporting requirements of the 2015 Permit and the CWA are ongoing and continuous.

208.   By committing the acts and omissions alleged above, the Owners/Operators of the Facility are subject to an assessment of civil penalties for each and every violation of the CWA occurring from April 10, 2014 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

209.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

210.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## VII.   **RELIEF REQUESTED**

211.   Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.     A Court order declaring Defendant to have violated and to be in violation of Sections 301(a) and (b) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b); for its unlawful discharges of pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent standards limitations which include BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit and the CWA.

b.     A Court order enjoining Defendant from violating the substantive and

procedural requirements of the Storm Water Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

      c.    A Court order assessing civil monetary penalties for each violation of the CWA occurring prior to November 2, 2015 at $37,500 per day per violation, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009);

      d.    A Court order assessing civil monetary penalties for each violation of the CWA occurring on or after November 2, 2015 and assessed on or after January 15, 2018 subjects Aluminum Precision to a penalty of up to $53,484 per day, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2016);

      e.    A Court order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

      f.    Any other relief as this Court may deem appropriate.

Dated: June 11, 2019               Respectfully submitted,

_____

Anthony M. Barnes
AQUA TERRA AERIS LAW GROUP
Attorneys for Plaintiff
LOS ANGELES WATERKEEPER